# IN THE SUPREME COURT OF IOWA

No. 13–1106

Filed January 9, 2015

**STATE OF IOWA,**

    Appellee,

vs.

**CARRIE McIVER,**

    Appellant.

---

Appeal from the Iowa District Court for Polk County, James D. Birkenholz, Judge.

Appellant challenges the rulings by the district court to deny her motions to suppress. **AFFIRMED.**

Brandon J. Brown of Parrish Kruidenier Dunn Boles Gribble & Gentry, L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Bridget A. Chambers and Jean C. Pettinger, Assistant Attorneys General, Joseph Williams, Student Legal Intern, John P. Sarcone, County Attorney, and Maurice W.B. Curry, Assistant County Attorney, for appellee.

**CADY, Chief Justice.**

In this appeal from a judgment and sentence entered by the district court against a motorist for operating while intoxicated, first offense, we must first decide if the peace officer made a valid stop under the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. If the stop was valid, we must then decide if a peace officer is required to offer a blood or urine test instead of a breath test to a motorist reasonably suspected of driving under the influence of a controlled substance or a drug other than alcohol. We find the stop was valid. We also conclude our legislature did not intend for the implied consent law to mandate a blood or urine test under such circumstances, but only intended to impose the implied consent penalty of license revocation for motorists suspected of driving under the influence of drugs other than alcohol who refuse to submit to a blood or urine test when requested by a peace officer. We conclude the district court properly overruled the pretrial motions to suppress the evidence, and we affirm the judgment and sentence of the district court.

### I. Background Facts and Proceedings.

In the early morning hours of October 14, 2012, an experienced Polk County Sheriff's sergeant observed a pickup truck stopped in a parking lot of an eastside Des Moines business located on Northeast 14th Street. The parking lot was located in front of the building and was separated from the road by an area of grass and a sidewalk that ran parallel to the street. The entrance and exit to the parking lot was located on an adjacent side street. The headlights of the pickup truck were illuminated, and the business was closed.

As the sergeant positioned his squad car to investigate, the pickup truck was driven from the parking lot onto Northeast 14th Street by

traveling over the grassy area, down the sidewalk for a brief period of time, and then over the curb of the street. The sergeant followed the pickup truck in his squad car and initiated a traffic stop after further observing the pickup truck weaving within its lane of travel. As it pulled over, the right side of the pickup went over the curb of the street.

During the stop, the sergeant discovered the pickup was driven by Carrie McIver. Her speech was slurred, and she was slow to respond to the sergeant's request for information. There were three passengers in the pickup, including McIver's husband.

The sergeant had McIver perform a variety of field sobriety tests. She failed most of the tests, but the sergeant did not detect any odor of an alcoholic beverage on her breath. He also attempted to administer several preliminary breath tests, but was unable to obtain a reading. The sergeant felt McIver was attempting to manipulate the test. She eventually refused further preliminary testing. The sergeant arrested McIver for improper use of lanes in violation of Iowa Code section 321.306 (2013).[1] She was transported to the Polk County Jail for processing by a Polk County deputy.

At the jail, the transporting deputy invoked the implied consent law and requested McIver submit to a breath test. She refused and requested a blood test be performed instead. McIver informed the deputy she wanted a blood test because she was taking prescription medication, including a central nervous system depressant. She denied that she had been drinking alcoholic beverages, although the deputy detected a slight odor of alcohol emanating from McIver. The deputy informed McIver that

---

[1]All references to the Iowa Code are to the 2013 Code unless otherwise indicated.

she could obtain a blood test after submitting to a breath test. She continued to refuse a breath test and insisted on a blood test. The deputy continued to insist on a breath test. As a result, no test was administered. Three prescription bottles were found in McIver's purse, including the prescription for a central nervous system depressant.

McIver was subsequently charged with operating while intoxicated, first offense. She moved to suppress the evidence against her, claiming the stop was made without probable cause or reasonable suspicion in violation of the United States and Iowa Constitutions. She also claimed the implied consent statute was violated when the deputy failed to administer a blood test after acquiring reasonable grounds to believe she was impaired by a prescription drug.

The district court denied the motions to suppress. McIver then waived her right to a trial by jury and stipulated to a trial on the minutes of testimony. The district court found McIver guilty of operating while intoxicated, first offense, and sentence was imposed.

McIver appealed. She claims on appeal that the district court erred in failing to suppress the evidence against her because there was no reasonable suspicion for the stop and the implied consent law was violated when the officer failed to request a blood or urine test.

## II.  Standard of Review.

We review constitutional issues de novo. *State v. Baldon*, 829 N.W.2d 785, 789 (Iowa 2013). Our review of issues involving interpretation of a statute is for correction of errors at law. *State v. Lukins*, 846 N.W.2d 902, 906 (Iowa 2014).

## III.  Validity of Stop.

McIver asserts the stop of the vehicle she was driving violated her right to be free from unreasonable search and seizure under the Fourth

Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. We follow an independent approach in the application of our state constitution. *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011). However, when a party does not argue an independent approach, "we ordinarily apply the substantive federal standards but reserve the right to apply the standard in a fashion different from federal precedent." *State v. Tyler*, 830 N.W.2d 288, 291–92 (Iowa 2013). McIver does not articulate any distinction in the scope and effect of the two constitutional provisions. Therefore, we consider the constitutional provisions separately, but proceed to apply them in the same manner for the purpose of resolving the claim in this case.

A traffic stop is permissible under our Iowa and Federal Constitutions when supported by probable cause or reasonable suspicion of a crime. *Delaware v. Prouse*, 440 U.S. 648, 654–55, 99 S. Ct. 1391, 1396–97, 59 L. Ed. 2d 660, 667–68 (1979); *Pals*, 805 N.W.2d at 774; *State v. Tague*, 676 N.W.2d 197, 201, 204 (Iowa 2004). Probable cause of a crime supports an arrest, while reasonable suspicion of a crime allows a peace officer to stop and briefly detain a person to conduct a further investigation. *See Tague*, 676 N.W.2d at 201, 204. When a peace officer observes any type of traffic offense, the violation establishes both probable cause to stop the vehicle and reasonable suspicion to investigate. *State v. Harrison*, 846 N.W.2d 362, 365 (Iowa 2014).

McIver argues that the manner in which she drove her vehicle did not support probable cause to believe she violated a rule of the road. The State suggests a variety of statutes governing the operation of motor vehicles in this state were violated by her operation of the pickup truck. We find it unnecessary to decide whether the officer actually observed a violation of a rule of the road. Instead, we conclude the officer had

reasonable suspicion of intoxicated driving to stop the vehicle and investigate.

Reasonable suspicion to stop a vehicle for investigative purposes exists when articulable facts and all the circumstances confronting the officer at the time give rise to a reasonable belief that criminal activity may be afoot. *Tague*, 676 N.W.2d at 204; *see also State v. Kooima*, 833 N.W.2d 202, 206 (Iowa 2013), *cert. denied*, 134 S. Ct. 1934 (2014). Thus, we do not evaluate reasonable suspicion based on each circumstance individually, but determine the existence of reasonable suspicion by considering all the circumstances together. *See United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750, 151 L. Ed. 2d 740, 749–50 (2002); *State v. Kreps*, 650 N.W.2d 636, 642 (Iowa 2002).

In this case, the stop occurred shortly after the bars in the city had closed for the night. The experienced arresting officer testified it was not uncommon for vehicles during this time period to pull off the road and stop to allow intoxicated occupants to urinate outside the vehicle. Here, the vehicle was stopped in the parking lot of a business that was closed. While these circumstances alone would be insufficient to support reasonable suspicion, they were relevant considerations. *See State v. Haviland*, 532 N.W.2d 767, 768–69 (Iowa 1995) (per curiam) (holding a vehicle stopped near a closed business only creates an inchoate suspicion). The manner in which the vehicle was operated when it left the parking lot was an additional circumstance to consider. Instead of leaving the parking lot through the exit to the street, the vehicle was driven by McIver over the grassy area surrounding the parking lot, down the sidewalk, and over the curb. This aberrant driving raised suspicion of impairment. *See Shellady v. Sellers*, 208 N.W.2d 12, 14 (Iowa 1973) (finding erratic driving supports an investigative stop). Finally, McIver

weaved within her lane of travel while she was followed by the officer. This circumstance alone does not necessarily support a reasonable suspicion to stop a vehicle, but adds to the totality of the circumstances. *See Tague*, 676 N.W.2d at 204–05; *see also State v. Otto*, 566 N.W.2d 509, 511 (Iowa 1997).

Considering all the circumstances together, the police officer had a reasonable suspicion that McIver might be operating a motor vehicle while intoxicated. Therefore, the investigatory stop of the vehicle did not violate the Fourth Amendment to the United States Constitution and did not violate article I, section 8 of the Iowa Constitution.

## IV. Interpretation of the Implied Consent Law.

We apply statutes to resolve legal disputes by first considering the plain meaning of the statute under consideration. *State v. Albrecht*, 657 N.W.2d 474, 479 (Iowa 2003). Under this approach, we only engage in statutory interpretation if the terms or meaning of the statute are ambiguous. *Id.* The statute is ambiguous if reasonable minds can disagree on the meaning of particular words or the statute as a whole. *State v. Hutton*, 796 N.W.2d 898, 904 (Iowa 2011).

The statute at issue in this case is Iowa Code section 321J.6, commonly referred to as the "implied consent law." Every person who operates a motor vehicle in Iowa under circumstances that give reasonable grounds to believe such operation was in violation of the operating while intoxicated law is deemed to have consented to chemical testing to determine the presence of intoxicating substances such as alcohol or other controlled substances. Iowa Code § 321J.6(1); *see also State v. Rains*, 574 N.W.2d 904, 912 (Iowa 1998) (stating the implied consent statute is premised on " 'the basic principle that a driver impliedly agrees to submit to [chemical testing] in return for the privilege

of using the public highways'" (quoting *State v. Hitchens*, 294 N.W.2d 686, 687 (Iowa 1980))). A person who refuses to submit to the requested test loses the privilege to drive. Iowa Code § 321J.9.

The implied consent law establishes the process and procedure to obtain a chemical test. Iowa Code section 321J.6(2) provides:

> The peace officer shall determine which of the three substances, breath, blood, or urine, shall be tested. Refusal to submit to a chemical test of urine or breath is deemed a refusal to submit, and section 321J.9 applies. A refusal to submit to a chemical test of blood is not deemed a refusal to submit, but in that case, the peace officer shall then determine which one of the other two substances shall be tested and shall offer the test. If the peace officer fails to offer a test within two hours after the preliminary screening test is administered or refused or the arrest is made, whichever occurs first, a test is not required, and there shall be no revocation under section 321J.9.

The implied consent procedure further provides in Iowa Code section 321J.6(3):

> Notwithstanding subsection 2, if the peace officer has reasonable grounds to believe that the person was under the influence of a controlled substance, a drug other than alcohol, or a combination of alcohol and another drug, a blood or urine test shall be required even after another type of test has been administered. Section 321J.9 applies to a refusal to submit to a chemical test of urine or blood requested under this subsection.

McIver acknowledges that a peace officer is authorized to decide the type of substance to be used for testing, but she asserts section 321J.6(3) requires a peace officer to affirmatively request a blood or urine test in the event the officer has reasonable grounds to believe the motorist is under the influence of a controlled substance, a drug other than alcohol, or a combination of alcohol and other drugs. The State argues the section requires the motorist to submit to a request for a

blood or urine test made by a peace officer or face a revocation of driving privileges.

The arguments of the parties reveal an ambiguity in the statute. The resolution of this case ultimately hinges on the meaning of the phrase "a blood or urine test shall be required" found in Iowa Code section 321J.6(3). This phrase is the main clause of the first sentence in the subsection, preceded by a prepositional phrase and the subordinating clause of the main clause.

The ambiguity is largely created by the absence of an object in the main clause to show who is affected by the phrase "shall be required." In other words, the main clause of the sentence does not contain a noun or pronoun to complete the action of the clause by identifying whether the blood or urine test is required to be requested by the peace officer or is required to be taken by the motorist in the event the subordinating clause is satisfied. The absence of greater specificity in the prepositional phrase also contributes to the ambiguity. It fails to identify which part of subsection 2 is modified by subsection 3.

As is often the case, ambiguities in statutes can be clarified by looking at the background and history of the statute. 2A Norman J. Singer & Shambie Singer, *Statutes and Statutory Construction* § 45:2, at 16–17 (7th ed. rev. 2014) ("Usually, in cases of genuine uncertainty about a statute's meaning and application, courts must consider the particular problem the legislature was addressing, prior legislative consideration of the problem, the act's legislative history, operation, and administration, and even preexisting common law." (Footnotes omitted.)). This approach works to resolve the ambiguity in this case.

The implied consent law was enacted by our legislature in 1963. 1963 Iowa Acts ch. 114, § 39 (codified at Iowa Code § 321B.3 (1966)).

The overarching legislative purpose of the implied consent law is to protect public safety and eliminate intoxicated driving from Iowa roads. *State v. Overbay*, 810 N.W.2d 871, 875 (Iowa 2012). The law utilized the legal doctrine of implied consent to make it possible for a peace officer to obtain a bodily substance for chemical testing from a driver suspected of operating while intoxicated, without the necessity of obtaining a search warrant. *Id.* The law does not physically force drivers to submit to testing, but operates to revoke their licenses to drive in Iowa if the requirement to submit to testing predicated on consent is refused following a request made by a peace officer in conformance with the law. Iowa Code §§ 321J.6, .9. Thus, the implied consent law creates an incentive for drivers to submit to testing.[2]

Section 321J.6 establishes the process for testing under the implied consent law. It accomplishes this by using three related subsections. Under the first subsection, "a peace officer" is authorized to "request" a "test or tests" when the officer has "reasonable grounds to believe" the person was operating a vehicle in violation of the law defining the crime of operating while intoxicated and any one of seven conditions are present. *Id.* § 321J.6(1).[3]

---

[2]The implied consent law has, since its inception, protected the driver's interests by providing that independent chemical testing may done at the driver's cost in addition and subsequent to the testing done at the direction of the peace officer. 1963 Iowa Acts ch. 114, § 40 (codified at Iowa Code § 321B.4(1966)); *see also* Iowa Code § 321J.11.

[3]The seven conditions are:

> *a.* A peace officer has lawfully placed the person under arrest for violation of section 321J.2.

> *b.* The person has been involved in a motor vehicle accident or collision resulting in personal injury or death.

> *c.* The person has refused to take a preliminary breath screening test provided by this chapter.

Under the second subsection, "the peace officer" then determines which of the three substances—breath, blood, or urine—shall be tested. *Id.* § 321J.6(2); *see State v. Bloomer*, 618 N.W.2d 550, 553 (Iowa 2000) (holding the peace officer determines the type of test). The subsection then establishes two exceptions or qualifications to the general implied consent rule that drivers who refuse to submit to testing lose their driver's license. *See* Iowa Code § 321J.6(2); *see also id.* § 321J.9 (describing the revocation process). While a driver who refuses to submit to a urine or breath test is subject to license revocation, subsection 2 declares that a refusal to submit to a blood test does not result in a license revocation. *Id.* § 321J.6(2). Instead, if a motorist refuses to submit to a blood test, "the peace officer" shall offer either a urine or breath test. *Id.* Thus, a driver has the right to refuse a request for a blood test without suffering the penalty of revocation. The other exception identified in subsection 2 is "a test is not required," and no revocation occurs, if "the peace officer fails to offer a test" within a two-hour window of time described in the subsection. *Id.*

---

*d.* The preliminary breath screening test was administered and it indicated an alcohol concentration equal to or in excess of the level prohibited by section 321J.2.

*e.* The preliminary breath screening test was administered to a person operating a commercial motor vehicle as defined in section 321.1 and it indicated an alcohol concentration of 0.04 or more.

*f.* The preliminary breath screening test was administered and it indicated an alcohol concentration less than the level prohibited by section 321J.2, and the peace officer has reasonable grounds to believe that the person was under the influence of a controlled substance, a drug other than alcohol, or a combination of alcohol and another drug.

*g.* The preliminary breath screening test was administered and it indicated an alcohol concentration of .02 or more but less than .08 and the person is under the age of twenty-one.

Iowa Code § 321J.6(1).

The third and final subsection contains the disputed language indicating that "[n]otwithstanding subsection 2," "a blood or urine test shall be required" when a peace officer suspects drugs other than alcohol are involved. It is followed by a declaration that the license revocation provisions apply to the "refusal to submit to a chemical test of urine or blood requested under this subsection." *Id.* § 321J.6(3).

While the general approach to testing based on implied consent has remained the same since the law was enacted in 1963, section 321J.6 governing testing has changed over time. These changes shed light on the legislative intent behind section 321J.6(3) to help resolve the ambiguity at issue.

Overall, the consent testing law is set up today as it was when originally enacted, except for the addition of the third subsection. As now, the first part of the testing statute authorized "a peace officer" to "request" a "test or tests." Iowa Code § 321B.3 (1966). Yet, at the time the law was enacted, only one condition needed to occur for the officer to request a test in addition to reasonable grounds to suspect the driver was violating the operating while intoxicated law. This condition required the officer to place the driver under arrest for that violation. *Id.* Additionally, no drug testing was available. Although the crime of operating while intoxicated prohibited driving "while in an intoxicated condition or under influence of narcotic and/or hypnotic drugs or a combination of such drugs and alcohol" at the time the implied consent law was enacted, *id.* § 321.281, implied consent could only be utilized "for the purpose of determining the alcoholic content of [the driver's] blood," *id.* § 321B.3.

The second part of the testing law was also generally the same as today. The original law authorized the peace officer to determine the type

of substance for testing and described the two current exceptions to consent pertaining to blood tests and the two-hour window of time in which the test needed to be given. *Id.* § 321B.3. With respect to a request for a blood test, a driver could refuse to submit, but was then required to submit to the withdrawal of another specimen requested by "such peace officer." *Id.*

Subsection 3, dealing with testing for drugs other than alcohol, was not added to the implied consent law until 1986. 1986 Iowa Acts ch. 1220, § 6 (codified at Iowa Code § 321J.6 (1987)). Thus, for over twenty years, the implied consent law operated only with the provisions now codified in the first two subsections. This initial approach under the law was understandable for two basic reasons. First, the implied consent law only applied to alcohol tests during most of this period of time. This limitation meant the provisions provided all the needed steps to invoke testing. Second, when the implied consent law was amended in 1984 to authorize the testing for drugs other than alcohol, the legislature necessarily contemplated that this drug testing would be fully accomplished under the existing testing procedures set out in the first two subsections. *See* 1984 Iowa Acts ch. 1292, § 10 (codified at Iowa Code § 321B.4 (1985) (amending the implied consent law to authorize drug testing). This conclusion is true because subsection 2 already authorized the peace officer to determine the type of substance for testing, and if the officer suspected drugs other than alcohol were involved, subsection 2 authorized the officer to select a specimen for testing that would detect the presence of such drugs. Thus, the original approach under the law operated to permit the testing of drugs other than alcohol when the officer suspected such drugs, just as subsection 2 continues to do today.

The fighting question in this case turns on the intent of the legislature to amend the testing statute by adding subsection 3 in 1986. Insight into the legislature's intent for this subsection is illuminated by examining the companion amendment to the addition of section 321J.6(3) in 1986. The legislature added another condition to subsection (1) to authorize a peace officer to request testing when the results of a "preliminary breath screening test" indicates the presence of alcohol at a level *less* than the legal limit and "the peace officer has reasonable grounds to believe that the person was under the influence of a drug other than alcohol or a combination of alcohol and another drug." *Compare* Iowa Code § 321B.4 (1985), *with* 1986 Iowa Acts ch. 1220, § 6 (codified at Iowa Code § 321J.6 (1987)). This amendment reveals the legislature was mindful that the administration of a test designed to detect alcohol may need to be followed by a test designed to detect drugs other than alcohol, and so provided statutory discretion for the peace officer to seek the additional test. It also reveals the reality that a peace officer may only begin to suspect drugs other than alcohol may be involved to explain impaired driver conduct after a test geared to detect the presence of alcohol fails to detect any alcohol or enough alcohol to explain the impaired conduct. In other words, multiple testing may be needed so that the purpose of the law can be accomplished. *See* Iowa Code § 321J.6(3) (1987) ("[A] urine test may be required *even after* a blood or breath test has been administered." (Emphasis added.)); *see also Bankson v. Iowa Dep't of Transp.*, 444 N.W.2d 515, 518 (Iowa Ct. App. 1989) (permitting a urine test following a breath test that resulted below the legal limit when officer had found marijuana seeds in driver's vehicle).

Yet, prior to 1986, the implied consent law did not specifically require a driver to submit to multiple testing. Once a peace officer initially administered a breath, blood, or urine test, the law did not also require the driver to submit to a second test when the results of the initial test did not support alcohol intoxication, even in the event the peace officer maintained reasonable grounds to suspect a drug other than alcohol or a combination of alcohol and other drugs could be the cause of the intoxication. Of course, subsection 3 specifically addressed this circumstance to permit multiple testing when drugs are suspected.

This background offers the best view into the intent of the legislature in enacting section 321J.6(3). It reveals the legislature intended to supplement the existing implied consent procedure in 1986 to fill a gap in the law by requiring a driver to submit to additional testing when the officer suspected the person was under the influence of a drug other than alcohol, even after another test has been administered.

There is nothing to suggest the legislature would have been concerned about imposing a legal requirement for the peace officer to offer a test that could detect drugs other than alcohol when such drugs were suspected, as an alternative to the existing procedures described in subsection 2. Instead, the background and history of the law shows the legislature was concerned about supplementing the law in 1986 to require drivers to submit to additional testing when drugs other than alcohol are suspected.

It is also important to recognize that the entire implied consent law is built on the legal premise that the consent deemed given by drivers under the law imposes a *requirement for drivers* to submit to chemical testing under penalty of license revocation when testing is properly requested by a peace officer. The concept of required testing at the

request of the officer is imbedded into the statute as a *requirement for drivers.* Thus, when the statute refers to "required" testing, it is reasonable that our legislature intended the object of the intransitive verb phrase "shall be required" to also be a *requirement for drivers.*

Further, there is no support for the notion that section 321J.6(3) was added to the implied consent statute in 1986 to help make evidence available to drivers and the State to aid in litigating the prescription-drug defense to the crime of operating while intoxicated.[4] Legislative intent needs to be based on tangible grounds, and the timing of legislative enactments and amendments is often one such ground. The timing of the amendments to the implied consent law could not be more important in this case because they show no connection between the prescription-drug defense and section 321J.6(3) implied consent procedures.

First, the prescription-drug defense applicable to controlled substances was not enacted by the legislature until 1998. 1998 Iowa Acts ch. 1138, § 12 (codified at Iowa Code § 321J.2(7)(*b*) (1999)). This twelve-year gap in time between the enactment of section 321J.6(3) and the 1998 amendment to the prescription-drug defense makes it unlikely, without some supporting evidence, that the defense had any connection to section 321J.6(3). Second, the legislature first enacted the statute

---

[4]Iowa Code section 321.281(7) (1985) and Iowa Code section 321J.2(6) (1987) identically provided:

> This section does not apply to a person operating a motor vehicle while under the influence of a drug if the substance was prescribed for the person and was taken under the prescription and in accordance with the directions of a medical practitioner as defined in section 155.3, subsection 11, if there is no evidence of the consumption of alcohol and the medical practitioner had not directed the person to refrain from operating a motor vehicle.

The legislature could have amended this section or otherwise connected it to the implied consent statute when recodifying it in 1986 under the new section number if they had so intended.

that excludes prescription drugs from the crime of operating while intoxicated in 1951, after it amended the crime to add driving under the influence of narcotic, hypnotic, or a combination of such drugs and alcohol,[5] as an additional definition. 1951 Iowa Acts ch. 119, § 3 (codified at Iowa Code § 321.281 (1954)). Thus, from the beginning, our legislature has not wanted the criminal laws prohibiting driving while drugged to apply to the valid use of prescription drugs. This history reveals this same intent was at work in 1998 when our legislature amended the prescription-drug defense to accommodate the parallel amendment that added operating "[w]hile any amount of a controlled substance is present in the person, as measured in the person's blood or urine" as an additional definition of the crime of operating while intoxicated. 1998 Iowa Acts ch. 1138, § 11–12 (codified at Iowa Code § 321J.2(1)(*c*), (7)(*b*) (1999)). The timing of these two amendments gives clear meaning to the intent of the legislature. There is nothing to suggest the 1998 amendments on controlled substances were tied to the 1986 amendment adding the supplementary test for the presence of drugs to the implied consent law.[6] Obviously, since the substantive crime was enlarged in 1998 to add the controlled-substance element to the crime, the existing prescription-drug defense needed to be enlarged to include prescription controlled substances.

---

[5]Narcotics were added to the crime in 1937 Iowa Acts ch. 134, § 312 (codified at Iowa Code § 5022.02 (1939)). Hypnotics and a combination of drugs and alcohol were added to the crime of operating while intoxicated in 1951 Iowa Acts ch. 119, §§ 1–2 (codified at Iowa Code § 321.281 (1954)).

[6]Rather, if the legislature had intended to link the amended subsection 3 to the prescription-drug defense, there presumably would have been some provision providing what substances the subsection 3 test should detect and in what amounts.

The other substantive change in 1998 was the addition of the option for the peace officer to seek a blood test under subsection 3. This change served to strengthen the peace officer's position, not to impose an entirely new requirement on the officer. First, this change meant there would always be an alternative test for the officer to request in an attempt to find the source of intoxication if initial testing showed lower than expected levels of intoxication, no matter which test was performed initially. Second, it provided a bodily substance for testing that was not dependent on the occurrence of specific bodily functions not in the control of the peace officer. Third, it created a limitation in subsection 3 to the previously absolute right of a driver to refuse a request for a blood test in subsection 2 by attaching the same legal consequences to the refusal of a blood test as would incur upon the refusal of the urine test. Under the amended subsection 3, the officer may require either blood or urine tests from drivers when drugs other than alcohol are suspected.

Accordingly, the history and background of the implied consent law reveals the legislature intended subsection 3 to supplement the testing protocol in subsection 2 to require drivers to submit to multiple testing requests when drugs other than alcohol are suspected. Additionally, the prepositional phrase was necessary to subsection 3 because the legislature was authorizing additional testing even after the driver's compliance with subsection 2. Thus, the object of the main clause in subsection 3 is drivers, not peace officers. Any other interpretation is contrary to the history of the statute, purpose of the statute, context of the statute, and grammatical structure of the statute.

Our interpretation of Iowa Code section 321J.6 (2013) conforms to our rules of statutory construction and is most closely aligned to the purpose of the implied consent procedures as well as the overall purpose

of the implied consent law. We conclude the peace officer in this case was not required to offer a blood or urine test to McIver under section 321J.6(3). The district court properly denied the motion to suppress.

## V. Conclusion.

The district court properly overruled the pretrial motions to suppress filed by McIver. We affirm the judgment and sentence of the district court.

**AFFIRMED.**

All justices concur except Wiggins, Hecht, and Zager, JJ., who concur in part and dissent in part.

**WIGGINS, Justice (concurring in part and dissenting in part).**

I agree with the court's opinion that the stop was valid under the Iowa and United States Constitutions. I also agree that an ambiguity exists in Iowa Code section 321J.6 (2013). However, I cannot agree with the way the majority resolves this ambiguity.

When interpreting a statute our goal is to determine legislative intent. *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004). The legislative history of a statute is instructive in ascertaining legislative intent. *State v. Dohlman*, 725 N.W.2d 428, 431 (Iowa 2006).

Prior to 1998, the statute read:

> Notwithstanding subsection 2, if the peace officer has reasonable grounds to believe that the person was under the influence of a drug other than alcohol or a combination of alcohol and another drug, a urine test may be required even after a blood or breath test has been administered. Section 321J.9 applies to a refusal to submit to a chemical test of urine requested under this subsection.

Iowa Code § 321J.6(3) (1997).

In 1998, the legislature amended chapter 321J. 1998 Iowa Acts ch. 1138, §§ 10–23. These amendments made two significant changes to chapter 321J that are relevant to this case. The first was to add the prescription-drug defense. *Id.* § 12 (now codified at Iowa Code § 321J.2(11)(*b*) (2013)). The prescription-drug defense is a defense to a charge of driving while under the influence of a controlled substance. *State v. Schories*, 827 N.W.2d 659, 665 (Iowa 2013). It is available to a defendant who is taking a controlled substance "prescribed or dispensed for the person and . . . taken in accordance with the directions of a practitioner and the labeling directions of the pharmacy." Iowa Code § 321J.2(11)(*b*). Prior to this amendment, the defense was unavailable.

At the same time the legislature added the prescription-drug defense, the legislature amended section 321J.6(3). 1998 Iowa Acts ch. 1138, § 16 (codified at Iowa Code § 321J.6(3)). The amendment provides:

> Notwithstanding subsection 2, if the peace officer has reasonable grounds to believe that the person was under the influence of *a controlled substanc*e, a drug other than alcohol, or a combination of alcohol and another drug, *a blood or* urine test *shall* be required even after *another type of* test has been administered. Section 321J.9 applies to a refusal to submit to a chemical test of urine *or blood* requested under this subsection.

*Id.* (emphasis added).

The key changes were to add "controlled substance" as a separate class of drugs, add a blood test, and change the word "may" to "shall." These changes clearly evidence a legislative intent to give meaning and support to the prescription-drug defense. This change recognized that many prescription drugs are controlled substances. *See Bearinger v. Iowa Dep't of Transp.*, 844 N.W.2d 104, 107 (Iowa 2014). By adding a blood test to this section, the legislature was adding another means of detecting the presence of a controlled substance in a person's body. Finally, by changing the word "may" to "shall," the legislature was making sure that if the officer suspected the defendant was driving under the influence of drugs, the officer must arrange to administer a blood or urine test to ensure the state and the defendant would have the necessary evidence to litigate the prescription-drug defense, if raised. In other words, the purpose of the amendment, as evidenced by the legislative history, requires the peace officer to do exactly what the statute says he or she should do—offer the defendant a blood or urine test if the peace officer has reasonable grounds to believe the person was under the influence of a controlled substance.

The next question is how would this work in the real world? The answer is simple. If the officer has reasonable grounds to believe the person was under the influence of alcohol only, section 321J.6(2) gives the officer the discretion to determine whether the person's breath, blood, or urine should be tested. *See* Iowa Code § 321J.6(2). If the officer chooses a blood test and the person refuses, the officer shall then offer either a breath or urine test as set forth in section 321J.6(2). *Id.*

If the officer does not have reasonable grounds to believe the person is under the influence of alcohol, but has reasonable grounds to believe the person is under the influence of a controlled substance or drug, section 326J.6(3) applies and the officer must offer the person a blood or urine test. *See id.* § 321J.6(3).

Finally, if an officer has reasonable grounds to believe a person is under the influence of a combination of alcohol and another drug, sections 326J.6(2) and (3) work in tandem. In this scenario, section 326J.6(2) gives the officer the discretion to determine whether the person's breath, blood, or urine should be tested, because the officer has reasonable grounds to believe the person is under the influence of alcohol. *See id.* § 321J.6(2). If the person refuses the tests required under section 326J.6(2), the consequences of the refusal apply and the state could prosecute the person for operating while under the influence of alcohol. *Id.* If the person submits to a breath test and it shows the person is over the legal limit for blood alcohol concentration, the officer can then decline to request the blood or urine test under section 326J.6(3), and the state could prosecute the person for operating while under the influence of alcohol.

If the state wants to prosecute the person for operating while under the influence of a controlled substance or a drug other than

alcohol, or for operating under the influence of a combination of alcohol and another drug, the officer must comply with section 321J.6(3) to proceed. *See id.* § 321J.6(3). This is why the legislature included the words "Notwithstanding subsection 2" in section 326J.6(3). The key to harmonizing the language of the statute to the legislative intent is to recognize that when the legislature codified the prescription-drug defense it also required the peace officer to offer the person a blood or urine test "if the peace officer has reasonable grounds to believe that the person was under the influence of a controlled substance, a drug other than alcohol, or a combination of alcohol and another drug." *Id.*

Applying this interpretation to the facts of this case, the officer did have a reasonable belief that McIver was under the influence of alcohol or a combination of alcohol and another drug. Officer Lumley testified he detected some smell of alcohol on McIver at the station. This coupled with the erratic driving gave the officer a reasonable belief that McIver was under the influence of alcohol or a combination of alcohol and another drug to permit an initial request for a breath test. Therefore, he properly followed the procedure under section 321J.6(2).

Accordingly, her refusal to take the breath test is admissible and the court should not have suppressed her refusal to take the test. However, the State charged McIver with operating a motor vehicle under the influence of alcohol or a drug. The court found her guilty of this charge. Because the officer did not offer McIver a blood or urine test, the court could only find her guilty of operating a motor vehicle under the influence of alcohol. Thus, I would remand the case for the court to determine on this record whether she was guilty of operating a motor vehicle under the influence of alcohol.

Hecht and Zager, JJ., join this concurrence in part and dissent in part.