## IN THE COURT OF APPEALS OF IOWA

No. 14-1678
Filed November 12, 2015

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**BRYAN JAMES ELDER,**
     Defendant-Appellant.

_____

     Appeal from the Iowa District Court for Mahaska County, Rose Anne Mefford, Judge.


     A defendant convicted of operating while intoxicated appeals the ruling on his motion to suppress evidence. **REVERSED AND REMANDED.**


     Grant C. Gangestad of Gourley, Rehkemper & Lindholm, P.L.C., West Des Moines, for appellant.

     Thomas J. Miller, Attorney General, and Kevin Cmelik and Jean Pettinger, Assistant Attorneys General, for appellee.


     Considered by Danilson, C.J., and Vogel and Tabor, JJ.

**TABOR, Judge.**

Bryan Elder appeals his conviction for operating while intoxicated, second offense, challenging the district court's denial of his motion to suppress. He alleges the police stop of his vehicle infringed his constitutional right against unreasonable search and seizure and contends police conduct at the station violated his rights under Iowa Code section 804.20 (2013). Because the vehicle stop was not justified by reasonable suspicion or by the officer's community caretaking function, we reverse the suppression ruling.

**I.     Background Facts and Proceedings**

As part of his routine patrol in the early morning hours of December 14, 2013, police officer Blaine Shutts performed "building checks" at various locations in Oskaloosa. At about 1:45 a.m., the officer drove by a car dealership and the VFW Hall, a local bar. In VFW parking lot he saw two vehicles, "one facing northbound, one facing southbound." He recalled the vehicles' lights were on, but he did not see anyone in the vehicles.

The officer proceeded to do his "building check" at a nearby farm implement store and then drove back by the VFW parking lot. He saw the lights of one of the vehicles, a black Hyundai, were now turned off and he saw "movement inside the vehicle with moisture on the windows." After seeing the movement, the officer "circled back around and got in behind the car, saw the vehicle was running." He activated his overhead lights and pulled in behind the Hyundai.

The officer walked up to the parked car and found Elder in the driver's seat and a female passenger. The occupants told the officer they were "just talking" while they waited for "her vehicle to warm up." The officer noticed the smell of alcoholic beverages from inside the car. Elder told the office he had consumed five or six beers. During his investigation, the officer allowed the passenger to enter the VFW, which was still open, to use the restroom.

The officer asked Elder to submit to field sobriety tests and a preliminary breath test. Based on the results of those tests, Officer Shutts placed Elder under arrest and transported him to the Mahaska County jail where the officer invoked implied consent. A DataMaster test measured Elder's blood alcohol level at .143.

The State filed a trial information charging Elder with operating while intoxicated, second offense, an aggravated misdemeanor, in violation of Iowa Code section 321J.2. Elder filed a motion to suppress evidence obtained as a result of the stop, citing the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Iowa Constitution. Elder also challenged the admission of the DataMaster test results under section 804.20 based on statements the officer made to him at the jail. The district court held a hearing on the motion to suppress; Officer Shutts was the sole witness.

At the suppression hearing, the State's only justification for the stop was the officer's community caretaking function. Both in a written brief and an oral closing argument, the prosecutor asserted the officer "had a duty as a community caretaker to investigate this situation." The prosecutor argued the officer had

probable cause to investigate only after smelling alcohol on the defendant and hearing his admission to drinking five to six beers. The defense argued the officer lacked reasonable suspicion to "stop" Elder's vehicle and "[n]o evidence was presented to show a factual basis for the officer's belief that the driver was in need of assistance."

The district court denied Elder's motion to suppress. The written ruling described the officer's stop as follows:

> Here, Officer Shutts, while assigned to patrol a specific non-residential area of the community for evidence of burglaries, etc., immediately noted the presence of the defendant's vehicle, motor running and lights on, with an apparent absence of occupants, at 1:45 in the morning, next to another apparently empty running vehicle. Officer Shutts passed by and then returned to the suspicious vehicle and this time observed occupants trying to duck under the door panel at his approach. Officer Shutts was unsure what was happening in the vehicle and decided to approach to investigate.

The court determined from the totality of the circumstances that the officer had reasonable suspicion to conduct an investigatory stop. As key circumstances, the court listed:

> the time of night, 1:45 a.m.; the location, a non-residential area of the city patrolled nightly by the city police department for evidence of burglaries, etc.; the location of the defendant at the farthest edge of the parking area from the VFW, while the building lights are out; and the furtive action taken by the occupants of the vehicle in attempting to duck below the door panel when Officer Shutts made his second approach.

The court did not address the community caretaking justification. The court also rejected Elder's arguments under section 804.20.

Elder was found guilty following a trial on the minutes of evidence. The court entered judgment and sentenced Elder to an indeterminate two-year term, suspending all but seven days. Elder now appeals.

## II. Scope and Standards of Review

We perform a de novo review of the suppression ruling to the extent that it raises the constitutional right to be free from unreasonable searches and seizures. *State v. Gaskins*, 866 N.W.2d 1, 5 (Iowa 2015). In doing so, we independently evaluate the totality of the circumstances found in the suppression and trial record. *Id.*

If we were to reach the portion of the suppression ruling based on section 804.20, our review would be for errors at law. *See State v. Walker*, 804 N.W.2d 284, 289 (Iowa 2011).

## III. Analysis of Constitutional Suppress Issue

It is undisputed that when Officer Shutts activated his lights and pulled in behind the Hyundai parked in the VFW lot, he executed a traffic stop, triggering Elder's protections under the Fourth Amendment and article I, section 8.[1] On appeal, the State argues the officer had reasonable suspicion to seize Elder's vehicle and, alternatively, the officer's actions constituted "legitimate community caretaking activity." Neither argument is supported by the suppression or trial record.

---

[1] Elder cites to both constitutional provisions but does not argue we should interpret the state constitution differently. Accordingly, for purposes of our analysis, we assume the legal principles governing the parallel provisions are the same. *See State v. McNeal*, 867 N.W.2d 91, 99 n.1 (Iowa 2015).

### A.    Reasonable Suspicion

"Reasonable suspicion to stop a vehicle for investigative purposes exists when articulable facts and all the circumstances confronting the officer at the time give rise to a reasonable belief that criminal activity may be afoot." *State v. McIver*, 858 N.W.2d 699, 702 (Iowa 2015). An investigatory stop based on reasonable suspicion is a well-established exception to the search warrant requirement. *State v. Vance*, 790 N.W.2d 775, 780 (Iowa 2010) (citing *Terry v. Ohio*, 392 U .S. 1, 21 (1968)). In deciding if the officer had reasonable suspicion, it is important to consider the circumstances collectively. *McIver*, 858 N.W.2d at 702.

As the district court correctly noted, it was relevant that the stop occurred at 1:45 a.m., just around the time that bars were closing. *See id.* But the early morning hour does not alone support reasonable suspicion. *See id.*

The court next cited the location of the stop, describing a business parking lot where the police patrolled nightly "for evidence of burglaries." The court also noted the VFW building lights were "out"—a finding not supported by the record. Officer Shutts testified there was a light, turned on, on the side of the building at the time of the stop and the sign out front was still on. The officer also testified the doors of the VFW building were unlocked and "[t]here were people still there." He did not know what time the VFW closed that night, and testified "apparently" it was still open to the public at the time of the stop. The officer testified other vehicles were parked at the VFW and Elder's car was not parked behind the building or concealed in any way.

The officer also addressed the issue of the routine patrol for evidence of burglaries; he acknowledged he did not have any reports of burglaries in that vicinity that night nor did he see any evidence of a possible burglary. This was not a case like *State v. Richardson,* 501 N.W.2d 495, 497 (Iowa 1993), where reasonable suspicion arose from the defendant's action of pulling out from the area of a closed business that had been frequently burgled.

The officer did not articulate why the presence of the two cars, one of which had its lights on the whole time, gave rise to a reasonable belief that criminal activity was afoot. He agreed nothing about the moisture on the windows of Elder's car indicated somebody was doing something wrong inside.

In its suppression ruling, the court relied in part on the "furtive action taken by the occupants of the vehicle in attempting to duck below the door panel when Officer Shutts made his second approach." The ruling overplays the significance of the movement seen by the officer, who testified he did not know if Elder ducked in response to seeing the patrol car or if he was just reaching down for something on the floor. The officer agreed there was "nothing criminal about moving around in a car." Our cases have identified "furtive movement" as a viable consideration in an officer's decision whether to stop a vehicle. *See State v. Haviland*, 532 N.W.2d 767, 769 (Iowa 1995) (discussing evasive movement of driver in reaction to seeing another private citizen). In this case, the suppression record did not support the presumption that the movement was an attempt to evade police attention.

Ultimately, under cross-examination, the officer agreed he had a "hunch" something might be going on in Elder's car, but "did not know if they'd done anything criminal. I was just checking on them." Our case law makes clear: "A mere hunch, unparticularized suspicion, or curiosity will not justify an investigatory stop." *Vance*, 790 N.W.2d at 781. The evidence of reasonable suspicion was so weak in this suppression proceeding that the trial prosecutor did not even pursue that basis for upholding the stop. On appeal, we conclude the State did not show by a preponderance of the evidence that a reasonable suspicion of criminal activity arose from the facts available to Officer Shutts. Accordingly, the reasonable-suspicion exception to the warrant requirement cannot support his seizure of Elder's vehicle.

**B.    Community Caretaking**

We now turn to the State's argument that Officer Shutt's seizure of Elder's car was justified under the community-caretaking exception to the warrant requirement. The United States Supreme Court recognized this exception because local police officers "frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).

Community caretaking cases follow a three-step analysis. *State v. Crawford*, 659 N.W.2d 537, 543 (Iowa 2003). Initially, we ask whether a seizure

occurred within the meaning of the Fourth Amendment.  If so, we inquire whether the police were conducting "bona fide community caretaker activity."  And if so, we ask whether the needs and interests of the public in that activity outweigh the intrusion upon the privacy of the citizen.  Bona fide community caretaker activity can fall into three categories: emergency aid, impoundment and inventory, and the public servant exceptions.  *See State v. Kurth*, 813 N.W.2d 270, 277 (Iowa 2012).  Our supreme court has explained the "narrow distinction" between the first and third doctrines:

> Under the emergency aid doctrine, the officer has an immediate, reasonable belief that a serious, dangerous event is occurring. . . . [I]n contrast, the officer in a public servant situation might or might not believe that there is a difficulty requiring his general assistance. For example, an officer assists a motorist with a flat tire under the public servant doctrine, but an officer providing first aid to a person slumped over the steering wheel with a bleeding gash on his head acts pursuant to the emergency aid doctrine.

*Crawford*, 659 N.W.2d at 541-42 (quoting Mary E. Naumann, *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception*, 26 Am. J. Crim. L. 325, 330–41 (1999)).

The State argues Officer Shutts testified he did not see any damage to either vehicle, did not see the driver slumped over the steering wheel, did not see any blood, and did not believe the occupants were injured.  Accordingly, the State appears limited to the public servant situation, where the officer believes a motorist might be having "a difficulty requiring his general assistance."

The State argues Officer Shutts was engaged in bona fide community caretaking activity when "he saw two cars parked in a relatively-deserted area

late on a December night when temperatures were below freezing, and the lights of one of the cars were first on, then off, and then on again." The State contends these circumstances suggested the possibility that one of the cars was having mechanical difficulties and needed assistance. The State's contention is belied by the officer's testimony. He did not testify the area was relatively deserted; rather he recalled other vehicles being present in the parking lot. He testified Elder's vehicle did not appear to be disabled, did not have any flat tires, did not have its flashers on, and the engine was running. The situation did not suggest mechanical trouble to the officer; rather he testified he was motivated to make the stop because he saw the occupants "duck underneath the door panel, like they saw me."

Even if the officer was acting as a bona fide public servant in checking whether Elder needed assistance, the detention of Elder, the passenger, and the vehicle "exceeded the scope of reasonably necessary community caretaking activity." *See Kurth*, 813 N.W.2d at 278. In *Kurth*, the court decided it was not necessary for the officer to block in an already parked vehicle, when all the officer "needed to do was to park next to him and approach him." *Id.* (noting any purported community care-taking function could have been accomplished through a consensual encounter rather than an investigatory stop). The community-caretaker exception to the warrant requirement does not support the officer's seizure of Elder's vehicle.

Because we order the exclusion of all evidence of Elder's intoxication based on the improper stop, we do not need to address the suppression issue

involving his rights under section 804.20. We reverse and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**