# IN THE COURT OF APPEALS OF IOWA

No. 17-1768
Filed February 20, 2019

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**HECTOR MARTINEZ LOBO,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, William A. Price, District

Associate Judge.

A defendant appeals his conviction for operating while intoxicated.
**AFFIRMED.**

Alexander Smith and Benjamin Bergmann of Parrish Kruidenier Dunn Boles

Gribble Gentry Brown & Bergmann, L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Thomas E. Bakke, Assistant

Attorney General, for appellee.

Considered by Tabor, P.J., and Mullins and Bower, JJ.

**BOWER, Judge.**

Hector Martinez Lobo appeals his conviction for operating while intoxicated (OWI). He contends a state trooper impermissibly stopped his car, and the district court should have granted his motion to suppress evidence gathered after the seizure. We find the district court properly denied the motion to suppress and affirm Martinez's conviction.

## I.      Facts and Prior Proceedings

Around 1:40 on a Sunday morning in May 2017, Iowa State Trooper Benjamin Lampe was patrolling Interstate 80 in Polk County. Driving eastbound, the trooper noticed a red Chevrolet Camaro merging onto the interstate from the Second Avenue onramp. The Camaro caught his attention because "[w]hen he merged on, he did not merge into or onto Interstate 80 eastbound until the very last moment, crossing, basically, the white solid line markers, what we call the gore[1] area, before merging onto the interstate kind of at the last minute or last second of the ramp." The driver also left his turn signal on for a "considerable distance" after merging.

The driver's actions prompted Trooper Lampe to continue to observe the Camaro. He activated his in-car video camera. Trooper Lampe testified:

> But [the driver of the Camaro], he made several lane violations that drew my attention further. He made lane violations to the left of the lane, crossing the white hash marker, and then also on the right side as well, which would—at that time, was a solid white line initially. And he was basically, what I consider, weaving within his lane and actually crossing outside of his traveled portion of his lane multiple

---

[1] "Gore," derived from Old English gār ("spear"), is defined as "a small usually triangular piece of land." *Gore*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/gore (last visited Dec. 12, 2018).

times. I believe I counted roughly five to the left and two to the right before I made the traffic stop.

The trooper observed the Camaro over the distance of about three and one-half miles.

After signaling the Camaro to pull over, the trooper could smell the odor of alcohol while speaking to the driver, Martinez Lobo, through the passenger-side window. When the trooper moved Martinez Lobo into his patrol car, he noticed the suspect's eyes were watery and bloodshot. The trooper conducted field sobriety tests, the results of which suggested Martinez Lobo was impaired. Martinez Lobo refused a breath test at the police station.

The State charged Martinez Lobo with OWI, in violation of Iowa Code section 321J.2 (2017), a serious misdemeanor. Martinez Lobo filed a motion to suppress, claiming the traffic stop was not warranted. At the suppression hearing, Trooper Lampe testified considering the time of night and defendant's driving, "I did suspect that there was something going on, either the driver is for some reason distracted or possibly impaired." He stated defendant committed lane violations by "[g]oing outside your designated travel portion of your lane." The video of the incident was presented into evidence.

The court denied the motion to suppress, ruling from the bench:

> The court finds that this is not an isolated incident . . . but rather a series of seven incidents of crossing or driving on the dashed lines or fog line and, as well, as leaving the turn signal on for approximately a minute, or slightly more, and driving across a part of the gore area in the attempt to switch lanes to remain on Interstate 80 rather than go off the East 14th Street exit.
> The court further finds that the court observed no actual violations of any Code section. So this case will rise or fall on whether or not the trooper had, or at the time of the stop, a reasonable articulable reason or reasons for an investigatory stop.

Based upon all of the foregoing findings, the court finds that the trooper did have a reasonable articulable reason or reasons for the investigatory stop: The consistent weaving within the lane, crossing the dashed lines to the left on five occasions, driving on the fog line on two occasions; leaving the turn signal on for approximately a mile after the necessity to have a turn signal on was over, that being having already switched lanes; as well as crossing over and through a part of the gore area at East 14th Street in order to change lanes.

After the suppression motion was denied, Martinez Lobo stipulated to a trial on the minutes of testimony. The district court made an oral finding Martinez Lobo was driving under the influence. The court entered judgment on the OWI offense. Martinez Lobo appeals, challenging only the suppression ruling.

## II.    Standard of Review

Martinez Lobo argues the investigative stop violated both his state and federal constitutional rights to be free from unreasonable search and seizure. *See* U.S. Const. amend. IV; Iowa Const. art. I, § 8. Because his claim is constitutional in nature, we review it de novo. *See State v. Tyler*, 830 N.W.2d 288, 291 (Iowa 2013). De novo review entails an "independent evaluation of the totality of the circumstances as shown by the entire record." *Id.* (quoting *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011)). While we give deference to the district court's factual findings, we are not bound by them. *Id.*

## III.   Analysis

The Fourth Amendment and article I, section 8 both prohibit law enforcement from conducting unreasonable searches and seizures. *Id.* A traffic stop is a seizure and is unreasonable unless the State demonstrates it was supported by probable cause or reasonable suspicion. *Id.* at 292. "If the State fails to carry its burden, all evidence obtained from the investigatory stop must be

suppressed." *State v. Vance*, 790 N.W.2d 775, 781 (Iowa 2010). The State argues both probable cause and reasonable suspicion support the stop here.

"[R]easonable suspicion of a crime allows a peace officer to stop and briefly detain a person to conduct a further investigation." *State v. McIver*, 858 N.W.2d 699, 702 (Iowa 2015). "Reasonable suspicion to stop a vehicle for investigative purposes exists when articulable facts and all the circumstances confronting the officer at the time give rise to a reasonable belief that criminal activity may be afoot. *Id.* "[W]e do not evaluate reasonable suspicion based on each circumstance individually, but determine the existence of reasonable suspicion by considering all the circumstances together." *Id.* When considering reasonable suspicion, it is "unnecessary to decide whether the officer actually observed a violation of a rule of the road." *Id.*

When there is a challenge on the basis of reasonable suspicion, "the State must show by a preponderance of the evidence that the stopping officer had specific and articulable facts, which taken together with rational inferences from those facts, to reasonably believe criminal activity may have occurred." *State v. Tague*, 676 N.W.2d 197, 204 (Iowa 2004). "Mere suspicion, curiosity, or hunch of criminal activity is not enough." *Id.*

Martinez Lobo points out, generally, when a person weaves within their own lane, *State v. Otto*, 566 N.W.2d 509, 511 (Iowa 1997), or "briefly cross[es] an edge line of a divided roadway," *Tague*, 676 N.W.2d at 205, this is not sufficient to give rise to a reasonable suspicion of criminal activity. He states his driving was not sufficiently erratic to give rise to a reasonable suspicion he was driving while

impaired. He also states the stop was not justified on the ground he was driving late at night.

We have carefully considered all of the evidence presented at the hearing on the motion to suppress, including the video from Trooper Lampe's patrol car. The evidence shows at about 1:40 a.m., Martinez Lobo traveled on the Second Avenue onramp to Interstate 80. Defendant continued in the far right lane, which became the exit lane for East Fourteenth Street, until just before he would have exited the freeway, when he merged to the left to continue on Interstate 80. In merging, he crossed solid white lines and the gore area. Defendant had turned on his left turn signal prior to merging, and the turn signal remained on for a "considerable distance." While driving, Martinez Lobo wove back and forth, sometimes crossing the solid white line on the right side of his lane and sometimes crossing the dashed white lines on the left side of his lane.

On our de novo review of the evidence, we conclude the trooper had a reasonable belief criminal activity may have been occurring. This case involves much more than a person weaving within their own lane, *Otto*, 566 N.W.2d at 511, or "briefly crossing an edge line of a divided roadway," *Tague*, 676 N.W.2d at 205. The totality of the circumstances, including the trooper's observations of defendant's driving and the time of night, show there were "specific and articulable facts, which taken together with rational inferences from those facts," would lead a person "to reasonably believe criminal activity may have occurred." *See Tague*, 676 N.W.2d at 204.

The circumstances presented here are in line with other cases where we have found there was a reasonable suspicion justifying a traffic stop. *See, e.g.,*

*State v. Keith*, No. 17-1044, 2018 WL 2174089, at *2 (Iowa Ct. App. Apr. 4, 2018) (noting vehicle touched the center line, then the fog line twice at about 2:00 a.m.); *State v. Torsky*, No. 15-0314, 2016 WL 2745908, at *2 (Iowa Ct. App. May 11, 2016) (finding at about 2:30 a.m., defendant swerved towards the center line and crossed the fog line on several occasions); *State v. Ballangee*, No. 11-1464, 2012 WL 2407693, at *3 (Iowa Ct. App. June 27, 2012) (noting defendant had crossed the center line twice "late on a Friday evening"); *State v. Rohrer*, No. 10-0830, 2011 WL 646905, at *2 (Iowa Ct. App. Feb. 23, 2011) (finding defendant drove on the center and fog lines "a couple times each" at about 2:00 a.m.); *State v. Byrne*, No. 09-0254, 2009 WL 3379106, at *3 (Iowa Ct. App. Oct. 21, 2009) (noting at about 1:00 a.m., defendant swerved back and forth, nearly hitting the curb and then completely crossing the center line twice); *State v. Fischels-Wordehoff*, No. 05-0762, 2006 WL 782447, at *3 (Iowa Ct. App. Mar. 29, 2006) (finding defendant drifted from side to side in the lane and went on the white shoulder marker "late at night"); *State v. Quastad*, No. 03-1550, 2004 WL 1396292, at *2 (Iowa Ct. App. June 23, 2004) ("[D]efendant was weaving both within and outside his lane at a time of day when officers might expect people to be driving home from bars.").

Because we have determined the traffic stop was proper on the basis of reasonable suspicion, we do not separately address the issue of probable cause. We determine the district court properly denied defendant's motion to suppress. We affirm Martinez Lobo's conviction for OWI.

**AFFIRMED.**

Mullins, J., concurs; Tabor, P.J., dissents.

**TABOR, Presiding Judge.** (dissenting)

I respectfully dissent. The district court should have granted Martinez Lobo's motion to suppress the evidence gathered after an impermissible traffic stop. The State's evidence did not support a finding of either probable cause or reasonable suspicion to pull over the Camaro.

## I.     Probable Cause

To justify a traffic stop under a probable-cause theory, the State must prove, by a preponderance of the evidence, the totality of circumstances would lead a reasonable person to believe "a crime has been or is being committed and that the arrestee committed or is committing it." *State v. Tague*, 676 N.W.2d 197, 201 (Iowa 2004). "When a peace officer observes a violation of our traffic laws, however minor, the officer has probable cause to stop a motorist." *Id.*

*A. Error Preservation.* On appeal, the State cites four statutes to bolster its assertion Martinez Lobo committed five distinct traffic violations,[2] any one of which could justify the stop. Martinez Lobo contends the State failed to preserve error on all but one of these appellate claims because the trial prosecutor argued only

---

[2] The State contends driving over the gore zone violated Iowa Code section 321.256 (2017), which states, in pertinent part, "No driver of a vehicle shall disobey the instructions of any official traffic-control device placed in accordance with the provisions of this chapter . . . ."; section 321.366(1)(a), which states, "It is unlawful for a person . . . to do any of the following on a controlled-access facility: (a) Drive a vehicle over, upon, or across a curb, central dividing section, or other separation or dividing line"; and section 321.366(1)(c), which further prohibits "[d]riv[ing] a vehicle except in the proper lane provided for that purpose and in the proper direction and to the right of the central dividing curb, separation, section, or line."

Additionally, the State argues crossing lane-dividing lines violated section 321.256 (quoted above) and section 321.306(1), which provides, "Whenever any roadway has been divided into three or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."

that Martinez Lobo failed to drive within the lane lines, a violation of section 321.306(1).[3]

The State maintains it preserved error despite failing to cite any code provisions at the suppression hearing. But the State's general assertion the trooper "clearly had probable cause" to stop Martinez Lobo based on his "poor driving" and "failing to maintain his lane" did not alert opposing counsel and the district court to the five distinct traffic violations alleged on appeal. *See Segura v. State*, 889 N.W.2d 215, 219 (Iowa 2017). During the suppression hearing, the prosecutor's probable-cause argument consisted of efforts to distinguish *Tague* and an allegation Martinez Lobo "fail[ed] to maintain his lane." Accordingly, the State preserved error only regarding a violation of section 321.306(1).

*B. Iowa Code section 321.306.* Drivers must keep their vehicles "as nearly as practical entirely within a single lane" and abstain from moving from one lane to another until first ascertaining "such movement can be made with safety." Iowa Code § 321.306(1). In *Tague*, our supreme court determined a violation of this statute only occurs when a driver changes lanes before determining it is safe to do so. 676 N.W.2d at 203. In *Tague*, "[t]here was no other traffic on the roadway" when the suspect's vehicle crossed the edge line. *Id.* Similarly, here, Martinez Lobo's red Camaro was the only car visible on Interstate 80 in Trooper Lampe's dash-cam video. Therefore, his movement outside his lane did not present a safety issue nor did the State offer evidence documenting Martinez Lobo failed to

---

[3] After conceding preservation of this argument in his appellant's brief, Martinez Lobo argues in his reply brief even section 321.306(1) fails because during the suppression hearing, the prosecutor said, "And 'violation' may not be the appropriate word under the actual language of the statute."

ascertain the safety of such movement. Applying *Tague*'s rationale, Martinez Lobo's driving did not amount to an unsafe lane change in violation of section 321.306(1), and thus, did not give the trooper probable cause for the stop. *See id.*

## II.     Reasonable Suspicion.

Having found no probable cause for the stop, I turn to the question of reasonable suspicion—the basis of the majority's holding. A driver's act of weaving may or may not create reasonable suspicion for an investigatory stop. In *State v. Tompkins*, our court held an officer's observation of a vehicle "weaving within its own lane gave rise to a reasonable cause to believe" the driver was "under the influence of intoxicants." 507 N.W.2d 736, 740 (Iowa Ct. App. 1993). But in *State v. Otto*, our supreme court clarified:

> We do not believe *Tompkins* should be read to hold that observation of a vehicle weaving within its own lane of traffic will always give rise to reasonable suspicion for police to execute a stop of the vehicle. Rather, the facts and circumstances of each case dictate whether or not probable cause exists to justify stopping a vehicle for investigation.

566 N.W.2d 509, 511 (Iowa 1997). More recently, in *Tague*, our supreme court found an "isolated incident of briefly crossing an edge line of a divided roadway" at 2:00 a.m. insufficient to give rise to suspicion of intoxication or fatigue. 676 N.W.2d at 205–06.

*Tompkins*, *Otto*, and *Tague* shape review of the suppression issue here. The trooper testified regarding the trajectory of Martinez Lobo's car.

> Well, first of all, we tend to see a lot of—at this time, with that driving behavior, it drew my attention and maintained my attention not just because they crossed the line but the multiple times crossing the line.

Looking at the totality of everything, with the late merge and leaving the turn signal on for an extended period of time and never making a lane change again, all these things, I start to look at the vehicle, make a determination before I stopped it, you know, what am I coming up to, what am I seeing?

You know, I see a lot of people that are doing tired driving. Unfortunately, I do see, you know, this day and age, people using cell phones, texting, things of that nature. And then also the obvious, which is driving impaired or intoxicated.

So I have a host of things that this could be. But at this time of night, you know, I did suspect that there was something going on, either the driver is for some reason distracted or possibly impaired.

To supplement the trooper's testimony, the State admitted his three-minute dash-cam video as an exhibit, showing the trooper's view of the Camaro. The video verifies Martinez Lobo drifted from one side of his lane to the other. Review of the video shows about one minute after the trooper activated the camera, Martinez Lobo's passenger-side tires cross the right-hand fog line, before he corrects course. The trooper can be heard narrating the video; after following for about ninety seconds, immediately after Martinez Lobo deactivated his blinker, the trooper voices his intent to stop the Camaro once it reaches the "East Mixmaster."[4] On two subsequent occasions, about twenty seconds apart, Martinez Lobo's driver-side tires touch the dashed lane-dividing line as the interstate curves.[5] The

---

[4] "East Mixmaster" is the phrase used by local commuters to describe the stacked interchange where Interstate routes 35, 80 and 235 meet near the northeast corner of Des Moines. *See, e.g.*, Todd Magel, *Iowa DOT Unveils Multimillion-Dollar Changes to 50-Year-Old Mixmaster*, KCCI (Oct. 16, 2017 6:26 PM), https://www.kcci.com/article/iowa-dot-unveils-multimillion-dollar-changes-to-50-year-old-mixmaster/13031535.

Thirty seconds later, Trooper Lampe again expressed his intent to stop Martinez Lobo, stating, "When we get to the East Mixmaster I'll stop him for lane violations, turn signal." About fifty seconds after that, Trooper Lampe says, "Get over the hill here, I'll make the traffic stop."

[5] After watching the video twice, the district court tallied five times the left rear wheel of the Camaro "crossed the dashed lines." That tally is at odds with my view of two times when the driver-side tires moved slightly across the lane lines.

Camaro drifts back toward the fog line again just before the trooper signals for a stop.

While the majority distinguishes Martinez Lobo's driving as "much more than" intra-lane weaving or briefly crossing an edge line, it misses the crux of *Tague* and *Otto*—the recognition that drivers rarely maintain a precise progression on the highway, even when they are neither intoxicated nor fatigued. *See Tague*, 676 N.W.2d at 205 (explaining "talking on their cell phone, looking at a map, adjusting the radio, adjusting the heater, defroster, or air conditioner, or checking a child restrained in the back seat can lead a driver to momentarily cross an edge line, without giving rise to reasonable suspicion of intoxication or fatigue."). Trooper Lampe acknowledged the "host of things" that could have been going on with the Camaro's driver. But the trooper did not articulate how the slight deviations in the Camaro's drive path justified an investigatory stop.

Although the State compares this case favorably to *Otto*, neither the video nor Trooper Lampe's testimony suggest Martinez Lobo's weaving was pronounced, "sharp," or "constant." *Cf.* 566 N.W.2d at 511. Trooper Lampe offered no testimony describing how his law-enforcement training or experience provided insight into Martinez Lobo's potential impairment,[6] or distinguishing

---

[6] The following exchange contains the extent of Trooper Lampe's testimony regarding his training:

> Q. How are you currently employed? A. Employed with the Department of Public Safety as a trooper for the State of Iowa.
> Q. And are you a State-certified peace officer? A. Yes, I am.
> Q. Have you been trained in enforcement of Iowa's traffic laws? A. Yes, I have.
> Q. Does that training include enforcement and administration of Iowa's drunk driving and implied consent laws? A. Yes.

And on cross examination, when defense counsel asked if Trooper Lampe would agree that Martinez Lobo's tires barely crossed the edge line for a brief period, Trooper Lampe

Martinez Lobo's driving from that of normal motorists. The State does not allege Martinez Lobo's vehicle fluctuated in speed. *Cf. id.*

The State argues Trooper Lampe's acknowledgement he could not rule out innocent explanations for Martinez Lobo's driving does not undercut its reasonable suspicion argument—because the purpose of investigatory stops is to resolve ambiguity. *See State v. Tyler*, 830 N.W.2d 288, 298 (Iowa 2013). But the State's argument fails to address whether the totality of the trooper's observations lead to a reasonable inference Martinez Lobo was intoxicated. *See State v. Vance*, 790 N.W.2d 775, 781–82 (Iowa 2010). Although conduct turning out to be wholly lawful and "subject to a legitimate explanation" may give rise to reasonable suspicion, *State v. Kreps*, 650 N.W.2d 636, 642 (Iowa 2002), "[i]f failure to follow a perfect vector down the highway or [keep] one's eyes on the road was sufficient reason to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of its privacy." *Tague*, 676 N.W.2d at 205–06 (quoting *United States v. Lyons*, 7 F.3d 973, 976 (10th Cir. 1993)).

The majority collects seven unpublished cases where our court found reasonable suspicion for a stop. But all seven feature a key distinction from the facts here: in each, the driver crossed or touched a *center* line rather than a *lane-dividing* line. *Cf. State v. Keith*, No. 17-1044, 2018 WL 2174089, at *2 (Iowa Ct. App. Apr. 4, 2018); *State v. Torsky*, No. 15-0314, 2016 WL 2745908, at *2 (Iowa Ct. App. May 11, 2016); *State v. Ballangee*, No. 11-1464, 2012 WL 2407693, at *1

---

responded, in pertinent part, "Believe me, I've been doing this job twenty years. I don't look at someone and say: Oh, they made a little touch the line. When I see this multiple, multiple violations and both side tires crossing the line, you're outside the line. Okay?"

(Iowa Ct. App. June 27, 2012); *State v. Rohrer*, No. 10-0830, 2011 WL 646905, at *1 (Iowa Ct. App. Feb. 23, 2011); *State v. Byrne*, No. 09-0254, 2009 WL 3379106, at *1 (Iowa Ct. App. Oct. 21, 2009); *State v. Fischels-Wordehoff*, No. 05-0762, 2006 WL 782447, at *3 (Iowa Ct. App. Mar. 29, 2006); *State v. Quastad*, No. 03-1550, 2004 WL 1396292, at *1–2 (Iowa Ct. App. June 23, 2004).

And there exists an equal amount of persuasive authority where we have found no reasonable suspicion based on scenarios more analogous to the facts here. *See, e.g.*, *State v. Ripperger*, No. 14-2108, 2016 WL 146525, at *3 (Iowa Ct. App. Jan. 13, 2016) (finding no reasonable suspicion where, at 2:26 a.m., officer testified he observed vehicle approaching from opposite direction and swerve into his lane then swerve back into the other lane); *State v. Loge*, No. 14-1734, 2015 WL 4935959, at *1 (Iowa Ct. App. Aug. 19, 2015) (finding no reasonable suspicion where officer testified he observed, at approximately 1:10 a.m., a car turn onto road and "immediately went to the right-hand side of the lane toward the fog line," then move "from the fog line then back to the center of the lane" "on several occasions within the first half mile or so," though "not a sudden jerking," "it was kind of a fast move" while driving ten miles per hour below the speed limit); *State v. Nguyen*, No. 13-0045, 2013 WL 5498072, at *1 (Iowa Ct. App. Oct. 2, 2013) (finding no reasonable suspicion where officer observed vehicle "weave within its own lane of travel," "come near a line marker" twice, "kind of riding the solid fog line," and "weaving . . . from lane marking to lane marking"); *State v. Dexter*, No. 10-1319, 2011 WL 3925478, at *1 (Iowa Ct. App. Sept. 8, 2011) (finding no reasonable suspicion where officer observed, at approximately 2:39 a.m., vehicle "going from fog line to center line multiple times. At times it appeared

that the vehicle was going to go into the ditch, but each time the driver corrected the vehicle"); *State v. Carney*, No. 10-1531, 2011 WL 3115849, at *1 (Iowa Ct. App. July 27, 2011) (finding no reasonable suspicion where, shortly before 2:00 a.m., officer observed vehicle "make a 'wide [left] turn going across lanes of traffic,'" "straddle the lane line and take up both lanes on East University Avenue and then move back into the right lane"); *State v. Lomax*, No. 10-1263, 2011 WL 2556956, at *1 (Iowa Ct. App. June 29, 2011) (finding no reasonable suspicion where officer testified, around 10:53 p.m., vehicle "was making full use of its lane, weaving from the left to the right, back and forth," and "cross the divider line to the right, come back across to the left, and then come over across to the right, brake heavily, and crank its steering or turn back into its left lane"); *State v. Troge*, No. 08-2029, 2009 WL 3064648, at *1, *3 n.5 (Iowa Ct. App. Sept. 17, 2009) (finding no reasonable suspicion where court described, based on video and officer testimony, "vehicle can be observed drifting slowly and gradually toward the center line and then back towards the middle of his lane. The vehicle can be seen traveling into the right hand lane and not signaling until the vehicle is largely in that lane"); *State v. Boley*, No. 04-1336, 2005 WL 1225614, at *2 (Iowa Ct. App. May 25, 2005) (finding no reasonable suspicion where officer, in following truck for more than two miles, observed truck "drift slowly from the center of its lane towards the curb on the right side of the road approximately four times," and "come close to the curb on two occasions," and "slowed down at an intersection even though the light was green"); *State v. Nikolsky*, No. 02-1813, 2004 WL 151070, at *5 (Iowa Ct. App. Jan. 28, 2004) (finding no reasonable suspicion and concluding officer's testimony appellant was "weaving" a mischaracterization when wheels of car "gradually

moved over and touched or slightly crossed the white line separating the right and left eastbound lanes a couple of times over a distance of at least seven miles, but the rental car was not constantly moving from side to side within the lane").

Further, I do not believe Martinez Lobo's "last minute" merge or failure to promptly shut off his turn signal add much to the equation.[7]  Trooper Lampe did not explain how those behaviors enhanced his suspicion Martinez Lobo was impaired.  *See United States v. Cole*, 948 F. Supp. 2d 1251, 1255–56 (W.D. Wash. 2013) (finding failure to switch off turn signal "describes too many individuals to create a reasonable suspicion" of criminal activity); *State v. Martinez*, No. 116,844, 2017 WL 5015409, at *2 (Kan. Ct. App. Nov. 3, 2017) (finding officer's observation of car leaving bar, activating turn signal and leaving it activated for two blocks without use, and traveling to another bar insufficient to give rise to reasonable suspicion of intoxication); *State v. Maxwell*, 15 N.E.3d 437, 442–43 (Ohio Ct. App. 2014) (finding straddling center dotted line, exiting a closed Air Force base, and leaving turn signal on for 300 yards insufficient to give rise to reasonable suspicion of impaired driving); *State v. Coyle*, No. 13 COA 001, 2013 WL 5288945, at *2 (Ohio Ct. App. Sept. 12, 2013) (finding weaving within lane and leaving turn signal on for ten seconds insufficient to give rise to reasonable suspicion); *cf. In re Pardee*, 872 N.W.2d 384, 394 (Iowa 2015) (finding oversight of leaving on turn signal after being pulled over of little significance in reasonable suspicion analysis).

---

[7] While the majority emphasizes Trooper Lampe's testimony that Martinez Lobo left his blinker activated for a "considerable distance" after merging onto the interstate, it does not reconcile that testimony with the dash cam video footage showing the turn signal blinking for just forty-one seconds after Martinez Lobo merged.

Nor do I believe the early morning hour transforms Martinez Lobo's otherwise-innocuous driving into suspicious driving.[8] Trooper Lampe did not testify Martinez Lobo's route suggested he was leaving a tavern. *See Tague*, 676 N.W.2d at 205 (finding, where the stop occurred at 2:00 a.m. and vehicle crossed left edge line, "no testimony as to any factors, which would support a reasonable suspicion" of intoxication or fatigue); *State v. Haviland*, 532 N.W.2d 767, 769 (Iowa 1995) (noting, in reasonable suspicion analysis, "12:30 a.m. on a Friday night/Saturday morning is not an unreasonable time to be out and about."); *cf. State v. McIver*, 858 N.W.2d 699, 702–03 (Iowa 2015) ("[T]he stop occurred shortly after the bars in the city had closed for the night. The experienced arresting officer testified it was not uncommon for vehicles during this time period to pull off the road and stop to allow intoxicated occupants to urinate outside the vehicle. Here, the vehicle was stopped in the parking lot of a business that was closed. While these circumstances alone would be insufficient to support reasonable suspicion, they were relevant considerations."). It is not reasonable to assume every driver on the road after midnight is intoxicated.

Trooper Lampe's testimony and the dash-cam footage leave us to reckon whether Martinez Lobo's driving suggested intoxication, and the majority fills in the

---

[8] At the conclusion of Trooper Lampe's testimony the prosecutor asked if the time of the stop was significant, to which he replied:

> As far as this type of stop, that we do generally see, this time of morning, you know, bars close around 2 a.m. in the State of Iowa.
>
> And so at the time of this stop, when I'm going through my coming up on this vehicle and observing not just the lane violations, a single lane violation, but multiple lane violations, the turn signal, the totality of everything, to include the time of the stop and the week, day of the week, I did suspect that this was likely an intoxicated driver.

gaps.[9]  *See Tyler*, 830 N.W.2d at 296 ("In his testimony, Officer Lowe stated that the license plate was 'blurred' and that the 'cover creates a glare at times,' but did not indicate why he thought the cover itself created any blurring or glare, as opposed to the normal glare that would come from an uncovered license plate or any of the other numerous colored license plates . . . .").  I do not believe the State carried its burden.  *See id.* at 293.  Martinez Lobo's late merge, his failure to promptly turn off his turn signal, and his unremarkable contact with lane dividing lines on an otherwise deserted interstate did not give rise to a reasonable belief he was committing a crime.  Martinez Lobo's "constitutionally protected interests" outweigh the "governmental interest advanced by the seizure" here.  *See id.* at 297.

An objective review of the facts compels the conclusion the stop violated Martinez Lobo's right to be free from arbitrary police intrusions as guaranteed by article I, section 8 of the Iowa Constitution.  *See Tague*, 676 N.W.2d at 206.  Because the seizure was unreasonable, all evidence stemming from the stop should be inadmissible.  *See Tyler*, 830 N.W.2d at 298.

---

[9] Courts in other jurisdictions have emphasized the importance of officer testimony in determining whether intra-lane weaving justified reasonable suspicion for an investigatory stop.  *See, e.g.*, *State v. Davis*, 933 A.2d 224, 226 (Vt. 2007) ("[T]he officer testified to his observations, but he never stated why those observations led him to a reasonable and articulable suspicion that a crime was being committed.  The officer testified that he encountered defendant at approximately two o-clock on Christmas morning.  He described her vehicle touching the center line and gliding onto the fog line at least twice before he turned on his mobile video recorder, and then continuing this pattern at least two more times after he began to record.  However, beyond this brief description of defendant's driving, the officer never testified that the intra-lane weaving supported a suspicion that defendant might be driving while under the influence.").